*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

DEMARCO TRAYMAN PRYOR MCCOVERY,

      Defendant-Appellant.

UNPUBLISHED
July 21, 2022

No. 348895
Otsego Circuit Court
LC No. 18-005512-FC

Before: GLEICHER, C.J., and SERVITTO and LETICA, JJ.

GLEICHER, CJ. (*concurring in part and dissenting in part*).

I concur with the majority's determination that the prosecution presented constitutionally sufficient evidence to sustain defendant Demarco McCovery's conviction for first-degree child abuse, MCL 750.136b(2). But I respectfully disagree with the majority's analysis of McCovery's ineffective assistance claim and would vacate his conviction and sentence on that ground.

## I. BACKGROUND CONTEXT

On the day of AN's tragic death, McCovery was caring for her and her two siblings. Frustrated and impatient with AN's crying as he tried to clean the house and entertain the other children, McCovery did exactly what he had been instructed not to do: he tightly swaddled AN in a blanket and placed her face down on a pillow. When he checked on AN six minutes later, McCovery discovered that she was not breathing.

Dr. Brian Hunter's testimony established that AN died within minutes of being placed in her crib. McCovery's decisions from that point forward were senseless and likely the product of panic, but no evidence supported that his failure to call 911, or his hunt for a gas station that would

-1-

accept his Bridge card, or his loud talking on his phone at the hospital, caused or contributed to AN's death.[1]

As the majority details, McCovery had been repeatedly informed of safe-sleep practices. Unfortunately, however, McCovery is not the only caregiver to have disregarded the advice and teachings of experts in safe-sleep practices. The Centers for Disease Control (CDC) estimate that approximately 3,500 children in the United States die every year due to preventable accidental suffocation as a result of unsafe sleep. See *About 3,500 Babies in the US are Lost to Sleep-Related Deaths Each Year*, Centers for Disease Control, January 9, 2018, available at <https://www.cdc.gov/media/releases/2018/p0109-sleep-related-deaths.html> (accessed April 19, 2022). A recent front-page *Washington Post* article highlights the frequency of sleep-related infant deaths attributable to parental negligence or disregard of safe-sleep teachings, and the failure of widespread parental education campaigns to prevent these deaths:

> In the years following the 1994 start of the Safe to Sleep campaign, which urged parents to put their babies on their backs at bedtime and keep their cribs free of pillows, bumper pads, blankets, stuffed animals and anything soft that might pose a suffocation risk, cases of sudden infant death syndrome (SIDS) plummeted by more than 50 percent. But then, the decline stopped.
>
> Some 3,400 babies under age 1 still die suddenly and unexpectedly each year. Of these, the number of infant deaths officially attributed to SIDS is probably an underestimate, experts say. In most cases, parents simply find their baby unresponsive in the crib—and autopsy practices are not standardized—so most of these heartbreaking deaths remain mysteries and are not always classified as SIDS.
>
> "The [SIDS] rates have been totally stagnant" for the past 20 years, says Fern Hauck, professor of family medicine and public health sciences at the University of Virginia School of Medicine and a SIDS researcher. "I think it's important that public health professionals be aware that these numbers are not going down." [Cimons, *Despite a Decades-Long Effort, Babies are Still Dying of SIDS*, The Washington Post, April 10, 2022, available at <https://www.washingtonpost.com/health/2022/04/10/how-common-is-sids/> (accessed April 19, 2022).]

Given the evidence that McCovery had been repeatedly informed of the risks of placing a child face down on a sleeping surface, the jury's determination that he had "knowingly or intentionally cause[d] serious physical harm" to AN is adequately supported. MCL 750.136b(2). But McCovery was acquitted of first-degree felony murder. Likely the jurors concluded that

---

[1] An expert witness would have assisted counsel in making this point, as well as communicating the argument central to the defense: that McCovery's acts before and after AN died were stupid and careless, but did not reflect an intent to harm AN.

McCovery knew the risks of swaddling AN and putting her face down on a pillow but were unpersuaded that he *intended* to kill the child.

This fissure in the prosecution's proof of the specific intent required to convict McCovery of first-degree child abuse was obvious from the outset. McCovery had no history of violence toward anyone and no motive to harm AN. By all accounts, his relationship with the children was loving and affectionate. As defense counsel readily conceded at the *Ginther* hearing,[2] McCovery's only defense was that he did not intend to suffocate AN and that her death was an accident. Counsel needed to convey that despite the lectures from Child Protective Service workers, McCovery made a terrible mistake—a mistake made by thousands of other loving parents who had also been trained in safe sleep. This was precisely the testimony that a defense forensic pathologist could have provided.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

This was defense counsel's first murder trial, and his first trial in a case involving an allegation of first-degree child abuse. In preparing to defend McCovery, counsel deliberately decided not to consult with an expert in forensic pathology, even after settling on an "accident" defense. Counsel's failure to seek the assistance of a forensic pathologist to buttress an accident defense and to fully flesh out the reasons that thousands of children die in sleep-related accidents every year fell below an objective standard of reasonableness. "Counsel did not have sufficient information to legitimate" his choice to forgo an expert. *People v Ackley*, 497 Mich 381, 390; 870 NW2d 858 (2015). Counsel's testimony at the *Ginther* hearing confirms that he had no objectively reasonable explanation for limiting his forensic investigation to "research" he allegedly conducted, evidence of which he failed to provide. See *id*. at 391.

Lacking an expert witness who could testify that McCovery's acts were more consistent with negligence than with murder, counsel was forced to rely on cross-examination of the prosecution's expert, Dr. Brian Hunter, to make that point. Dr. Hunter is an experienced forensic pathologist who has testified for the prosecution in hundreds of cases. Not surprisingly, counsel's efforts to advance an accident defense through Dr. Hunter fell flat.

At the *Ginther* hearing, counsel testified that he decided not to consult an expert because Dr. Hunter's "first autopsy report," allegedly prepared before Dr. Hunter consulted with the police investigators, "basically stated that there's no way that he could determine this was a homicide[,] that this was indeterminate." But counsel never connected those dots. He never questioned Dr. Hunter about a "first autopsy report," and no such report was admitted in evidence. And Dr. Hunter made it clear that he *always* considers investigative reports before rendering conclusions about the cause and manner of death. Counsel's logic escapes me, given that the jury was going to see the reenactment video and hear testimony regarding McCovery's safe-sleep training.

---

[2] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

With a single question and answer, counsel attempted to show that absent a history, Dr. Hunter would have characterized the manner of AN's death as "indeterminate." But like the rest of the cross-examination, the point elided an accident defense and did nothing to help McCovery:

> *Q.* OK, now you stated, and I understand that --- well let me ask this a different way. Take away, just for the sake of argument, because I know this is necessary in your line of work. But for the sake of argument you don't have a history, and you don't have scene investigators. Is there any way that you would have determined the cause of death?

> *A.* Based on the information I have it would be undeter (sic), cause of death were to be undetermined. Manner of death would be indeterminate or undetermined.

Counsel did elicit testimony from Dr. Hunter describing other infant deaths, but none of them resembled AN's. Dr. Hunter offered counsel nothing even vaguely exculpatory in his responses. Most critically, when cross-examining Dr. Hunter about *this* case, counsel never once used the word "accident."[3] Counsel's final cross-examination questions of Dr. Hunter addressed parental knowledge of safe-sleep practices and "shared sleep" surfaces (an unrelated issue), but led to an answer that reinforced the prosecution's case:

> *Q.* Okay, shouldn't, shouldn't they know not to do that?

> *A.* Again, it, it kind of depends on where they are in life. You know, if you've never had a child you may not know it, because you may not of gone through the post birth training on unsafe sleep. So you may not know it. Or if you --- you may not have had someone tell you. So if you're caring for a child, you have no experience, you may not know it. I think, I think for the most part [it's] been out there long enough. Someone's heard something about it, but I don't necessarily know that everyone knows the minutia about it.

Defense counsel ineffectively decided to advance an accident defense on behalf of McCovery through the testimony of the state's experienced forensic witness without having

---

[3] On recross-examination defense counsel again failed to elicit meaningfully exculpatory testimony from Dr. Hunter:

> *Q.* . . . And are you aware of --- let me put it to you this way. You said in the beginning that you tried to go over this [with] parents, new parents, and for whatever reason or another they got a lot going on. Just doesn't register.

> *A.* I've never been involved with it, but yes that has been the argument made by some, correct.

An expert would have made that argument.

educated himself about the frequency of similar deaths. If counsel truly had consulted forensic pathology literature, as he claims to have done, no evidence of his education emerged during the cross-examination. A five-minute Google search on the subject would have revealed the CDC report and dozens of articles calling into question the efficacy of safe-sleep training. A forensic pathologist would have informed counsel that SIDS deaths occur all too frequently under similar circumstances, even after safe-sleep training, and would have testified to that effect. Evidence supporting an accident theory was never presented, however, because counsel was stuck with Dr. Hunter's answers to any questions that might have opened the door to that defense, and Dr. Hunter easily rebuffed counsel's inept inquiries.

Instead of evaluating the reasonableness of defense counsel's representation, the majority focuses on what it views as fatal gaps in the testimony of Dr. Ljubisa Jovan Dragovic, a forensic pathologist retained by appellate counsel, who prepared a report and testified at the *Ginther* hearing. Dr. Dragovic's opinions were informed by his review of the autopsy report and Dr. Hunter's trial testimony. Dr. Dragovic agreed with Dr. Hunter's conclusion that AN's cause of death was asphyxia due to suffocation by blockage of her nose and mouth. He repeatedly reiterated his awareness that AN had been swaddled in a blanket; this point was also the subject of many pages of Dr. Hunter's trial testimony and Dr. Dragovic could not possibly have been overlooked it. In Dr. Dragovic's view, however, wrapping the child in a blanket and placing her face down in the crib was "an act of stupidity . . . rather than a purposeful act[.]" His report explained:

> While swaddling is a purposeful act to secure an infant by limiting the potential trauma resulting from uncontrolled movement, ignorance of the adult caretaker cannot be overemphasized. Hence, it is difficult, if not impossible to rule out *accident* as the manner of death beyond reasonable doubt in this case. [Emphasis in original.]

Dr. Dragovic steadfastly maintained at the *Ginther* hearing that AN's death was an accident rather than a homicide, notwithstanding that she had been tightly swaddled. Although swaddling is a "purposeful act," he explained, it is not comparable to "loading a firearm." Dr. Dragovic emphasized that despite 30 to 35 years of public health efforts to eradicate infant deaths caused by unsafe sleep practices, people sometimes "lose the child that they desperately wanted" due to "the loss of attention for a particular moment in time." He lamented: "[I]t seems it happens on and on, again and again."

According to the majority, Dr. Dragovic's testimony did not overcome the presumption that defense counsel had performed reasonably because Dr. Dragovic had not reviewed the reenactment video or "the trial testimony concerning the extensive safe sleep training defendant received." The majority does not explain why these two "omissions" bear relevance to defense counsel's performance or detract from the evidentiary power of Dr. Dragovic's opinion that deaths such as AN's are the product of stupidity and usually accidental rather than knowing. Dr. Dragovic was fully aware that the child had been tightly swaddled in a manner that covered her nose and mouth, and his testimony establishes that he factored that into his opinion. Dr. Dragovic repeatedly expressed frustration that parental education had not eradicated suffocation deaths, thereby reflecting his awareness or his assumption that McCovery had received that training. Viewing the video or perusing the social workers' testimonies would have added nothing. No evidence supports that Dr. Hunter reviewed the reenactment video or the social workers' trial testimony

either, discrediting the majority's claim that these efforts were necessary to a full understanding of what happened.

Nor can I agree with the majority's conclusion that it was not reasonably likely that a defense expert's testimony would have made a difference in the outcome. The simple fact that the jury acquitted McCovery of first-degree felony murder means that the jury rejected the prosecution's claim that McCovery intentionally killed AN. An expert would have allowed counsel to argue that safe-sleep counseling does not always work despite its repetition, especially when parents are stressed or tired. This would have been a powerful message, given that McCovery had no motive to kill AN and that other evidence documented that he cared deeply for AN and for her siblings. Expert testimony would have permitted counsel to argue that McCovery made a tragic mistake on the day AN died—a mistake made by thousands of parents every year. Without expert testimony, however, counsel could not link McCovery's errors to those of other parents. Making the effort to humanize McCovery was especially important in this trial. The record reflects that McCovery is black; AN, the other children, and the jurors, were white. Establishing that parental safe-sleep negligence cuts across *all* communities and socio-economic realms would have gone a long way toward refuting that McCovery knowingly harmed AN.[4]

Paraphrasing the Supreme Court's summary in *Ackley*, 497 Mich at 397, I cannot say with certainty that an expert would have ensured McCovery's acquittal, but I am convinced that "counsel's failure to prepare or show up for the battle" armed with the ammunition needed to persuade a jury that AN's death was accidental undermines my confidence in the outcome.[5] McCovery had but one avenue of avoiding conviction: educating the jury about the prevalence of SIDS deaths at the hands of good parents who negligently fail to heed public health warnings, and do not intend to harm their children. Due to counsel's ineffective decision to forego the assistance of an expert, he lacked the information he needed to construct this argument, and the tool to make the argument work in the courtroom. I would vacate McCovery's conviction and remand for a new trial.

## III. MCCOVERY'S SENTENCE

Counsel's ineffectiveness also infected McCovery's sentence.

The trial court upwardly departed from the sentencing guidelines, which called for a minimum sentence of 126 to 210 months. McCovery's minimum sentence of 20 years represents a 30-month enhancement.

---

[4] I am puzzled by the majority's reference in footnote 5 to information in a CPS file that was deemed inadmissible by the trial court. This information is not legally relevant to the issues before this Court. It has no impact on whether McCovery's counsel performed ineffectively.

[5] I would also hold that counsel performed ineffectively by failing to object to the admission of the detectives' opinion testimony. The trial court's intervention prevented this error from being outcome determinative.

The trial court's justification for imposing a departure sentence rested largely on the fact that McCovery had been educated about safe sleep, but had ignored the lectures. The court began its explanation for the departure by highlighting McCovery's malfeasance:

> The fact of the matter is, is you were taught by people who were there to teach you, that you can't do exactly what you did in this case. That enhances, in my view, the seriousness of the offense. Because this wasn't something that I think fairly can be explained as you didn't know. I don't think that's fair.

> I think that's unfair, and I think that ignores the CPS testimony that they were there routinely talking to you about these risks. And ignores that only months before [AN's] tragic death she was found alone with a blanket and a pillow in the crib. And Mr. Mathias removed those things and instructed you again about what could happen if you did exactly that. I look then at the factors that were inadequately considered by the guidelines.

This theme permeated the rest of the court's sentencing rationale. Had defense counsel provided the court and the jury with readily available evidence that even good parents, similarly educated on safe sleep, have also negligently disregarded safe-sleep teaching, this basis for departing would have lost its power.

As the majority acknowledges, before departing from the minimum sentencing guidelines range, a trial court must engage in reasoning consistent with the "principle of proportionality" set forth in *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990). Our Supreme Court highlighted the integral role of proportionality analysis in *People v Babcock*, 469 Mich 247, 262; 666 NW2d 231 (2003):

> In determining whether a sufficient basis exists to justify a departure, the principle of proportionality—that is, whether the sentence is proportionate to the seriousness of the defendant's conduct and to the defendant in light of his criminal record—defines the standard against which the allegedly substantial and compelling reasons in support of departure are to be assessed.

In applying the principles of proportionality, a departing court's reliance on facts subsumed within a defendant's guidelines score is misplaced:

> [D]epartures are appropriate where the guidelines do not adequately account for important factors legitimately considered at sentencing. For example, as the dissent points out, a sentencing judge could legitimately depart from the guidelines when confronted by the unlikely prospect of a one hundred-time repeat offender, since the guidelines do not take such extensive criminal records into account. In addition, we emphasize that the guidelines should continue to reflect actual sentencing practice. To require strict adherence to the guidelines would effectively prevent their evolution, and, for this reason, trial judges may continue to depart from the guidelines when, in their judgment, the recommended range under the guidelines is disproportionate, in either direction, to the seriousness of the crime. [*Milbourn*, 435 Mich at 657.]

The trial court concluded that the scoring for Offense Variable (OV) 3, which dictates a score of 100 points when "a victim was killed," inadequately accounted for the fact that AN was an infant:

> And while it's true that . . . OV-3 was scored at [100] which is the maximum that it can be scored at, it's correctly scored because your offense led to the death of a person. And that person happened to be a one year old. I don't find that OV-3 can possibly take into account the level of pain and suffering and loss that everyone has when we're dealing with a, just over one year old baby. I couldn't possibly find that.

> \* \* \*

> A death alone, and the scoring of [100] points, can't adequately consider that it's a one year old that's being cared for by you. So that factor, although it's [100] points, and although that maxes out your [OV] scores, it just can't possibly account for the severity of this offense.

The gut-wrenching nature of *every* baby's death is undeniable. McCovery was convicted of first-degree child abuse, which presumes that he harmed a child. First-degree child abuse contemplates that a child was severely injured or killed. And OV 10, for which McCovery was scored 10 points, addresses the "exploitation of vulnerable victims." See MCL 777.40(1)(b) ("The offender exploited a victim's physical disability, mental disability, or youth . . . or the offender abused his or her authority status."). In my view, the trial court did not adequately explain why the guidelines and the sentencing grid failed to adequately account for the fact that AN was an infant.

The trial court also erred by departing based on facts contrary to the record. Dr. Hunter's testimony established that AN died within a few minutes of being laid face-down in her crib. The trial court enhanced McCovery's sentence based on its finding that McCovery delayed her resuscitation and "prolonged her suffering," which the record simply does not support:

> The fact that you stopped at four different locations attempting to buy gas with a bridge card. All of which, even if reasonable because you were running out of gas, prolonged the suffering of [AN] and prevented any real medical care from ever reaching her. Your anticipation was that she was dead. But no one knows that except [AN].

> And certainly to the extent you got [AN] to an emergency room where she could get medical care in a timely fashion she might still be with us. But she's not because it took you [27] minutes to get three and a half miles while stopping at four

different locations with other children in the car. Along with what you described to the police officers as a body, a dead body.[6]

Nor did the trial court accurately conclude that McCovery failed to express remorse for AN's death. The presentence report indicates that on several occasions McCovery declared that he had no intention to kill the child. At his sentencing, McCovery began by apologizing "for everybody that's involved in this hurt," reiterated that "it was unintentional," and expressed that he "loved this child." He attempted to explain that after realizing that AN was dead, he was simply "numb" in disbelief.

The trial court's conclusion that McCovery failed to show any remorse is not borne out by the record. I fear that the trial court has confused remorse with responsibility. McCovery should not be penalized for maintaining that AN's death was an accident. Although the jury found otherwise, a properly structured defense would have permitted precisely that conclusion.

Finally, the trial court failed to articulate why an additional 30 months' incarceration was more proportionate than, for example, an extra 10 months. McCovery's Prior Record Variable (PRV) level was 2, placing him in the B grid. His minimum sentence of 240 months would be proportionate for an offender in the D grid (with a PRV score of 25 to 49), but McCovery had no criminal history except for a marijuana offense.

I would hold that the trial court clearly erred in departing from the guidelines based on nonrecord facts, and abused its discretion by imposing a unreasonable departure sentence.

/s/ Elizabeth L. Gleicher

---

[6] The majority repeats the trial court's factual error. Contrary to the majority's footnote 11, the "time spent at the gas station" had nothing to do with AN's death. Dr. Hunter established that the child was dead before McCovery turned her over in the pack-and-play.